[Cite as *State v. Hodge*, 2013-Ohio-5879.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

TRUMBULL COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-T-0037** |
| JOY DENISE HODGE, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2011 CR 584.

Judgment: Affirmed.


*Dennis Watkins,* Trumbull County Prosecutor, and *LuWayne Annos,* Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow,* 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).


CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Joy Denise Hodge, appeals from the judgment of the Trumbull County Court of Common Pleas, convicting appellant of murder, felonious assault, and endangering children. For the reasons discussed in this opinion, we affirm.

{¶2} On September 5, 2011, various neighbors living on Transylvania Avenue in Warren, Ohio convened to have a barbeque celebrating the Labor Day holiday. Among the group was appellant, Amanda Clay, Vanity Wallace, and Tiffany Davenport.

The group ate, drank liquor as well as wine, and smoked marijuana throughout the day. They ultimately convened at Vanity Wallace's apartment and continued carousing late into the evening. At approximately 9:00 p.m., Chris Foster, another neighbor and appellant's ostensible boyfriend at the time, stopped by the apartment to socialize. While there, Foster had a drink or two and smoked marijuana with the others. Foster left around 10:30 p.m., and went back to his apartment and fell asleep.

{¶3} Appellant left Wallace's apartment sometime after 11:00 p.m. Near midnight, appellant phoned David Brantley, the father of appellant's 15-month-old daughter, A.B., the victim herein. Appellant invited Brantley to visit her apartment, but he declined the offer.

{¶4} Meanwhile, at Wallace's apartment, the remaining partiers had recently ran out of liquor. Recognizing all liquor stores were closed, they decided to go to a bar. Amanda Clay went to retrieve appellant at her apartment, but discovered appellant's door was locked. She found this unusual because appellant generally left her door unlocked when she was home. Clay, however, asked Foster, who was at his home, to open appellant's apartment with his spare key. Foster opened the door and apparently returned to his home. After some discussion, appellant agreed to accompany Clay and several others to the bar. The group met at the bar around 12:15 a.m. and 12:30 a.m., where they drank, danced, and sang Kareoke until approximately 2:30 a.m. The record does not disclose who, if anyone, stayed with appellant's children, A.B. and her other two-year-old daughter, while appellant was out.

{¶5} At 2:28 a.m., appellant called Brantley again and told him their daughter, A.B., was in the hospital with an ear infection. Brantley testified he heard loud music in

the background and asked appellant why she was at a party if the victim was in the hospital. Appellant became irritated with Brantley and "lashed out" with a volley of vitriolic remarks. Given appellant's truculence, Brantley hung up. Appellant continued to phone Brantley, but he refused to take her calls. Appellant and the others returned to their homes and did not see one another until the next day.

{¶6} The next morning, appellant went to a dentist's appointment around 9:45 a.m. And, around 1:00 p.m., Antonia Rodgers encountered appellant, distressed and crying, near her apartment. Appellant bluntly told Rodgers she had just discovered A.B. dead in her crib. Appellant claimed she last checked on A.B. at 8:00 a.m., gave the baby a "sippy cup," and left her to rest. Rodgers called her sister, Lekeishia Blackburn, another neighbor, and the two women accompanied appellant to her apartment. Upon arrival, they observed the lifeless body of A.B. in her crib. Rodgers called 911 and Blackburn unzipped the child's nighty in an attempt to find a pulse. She immediately noted the child was cold and stiff. She also noticed a mark on A.B.'s face and bruises on her chest and ribs. Although Blackburn attempted CPR, she stopped upon the recognition the victim was too stiff to move. Blackburn, dubious of appellant's earlier contention, told appellant she did not believe she checked on the child at 8:00 a.m. because the victim "was way too cold, like somebody had just pulled her out of a freezer."

{¶7} Within minutes, first responders Michael Nelson and Theodore Pettigrew, both EMTs, arrived at the scene. They checked the baby and described her as "cold and rigor'd stiff." Both confirmed Blackburn's observations of visible bruising on the

3

child's face and extremities. While surveying the scene, Pettigrew overheard appellant on her cell phone exclaim: "Get your fucking ass here. Your baby is dead."

{¶8} Certified forensic death examiner Rebecca Bluedorn was subsequently called to the scene. Bluedorn assessed the condition of the body, noting bruising to the child's left cheek, right abdomen, belly, and thighs. Appellant told the emergency personnel and the investigator she had last seen A.B. alive at 8:00 a.m.

{¶9} An autopsy was conducted on September 7, 2011 by Trumbull County Coroner, Dr. Humphrey Germaniuk. He noted various areas of bruising on A.B.'s face, back of the head, both thighs and redness to her chest. The child's liver was lacerated, indicating blunt force trauma. The doctor also noted hemorrhaging to the abdomen and swelling to the brain. As a result of his examination, Dr. Germaniuk concluded the cause of death was homicide due to multiple blunt force injuries. The injuries, in his medical opinion, were a result of an assault. Death, in his opinion, occurred within minutes of when the injuries were inflicted.

{¶10} Due to the condition of the body when it was discovered, Dr. Germaniuk opined A.B. died between 1:30 a.m. and 5:30 a.m. on September 6, 2011. When asked how he drew this conclusion, the doctor observed that A.B.'s body was in full rigor at the time she was discovered. And, physiologically, rigor mortis plateaus between eight and 12 hours after death. Because the EMT report indicated an arrival time of 1:30 p.m. September 6, the doctor stated a "low ball" time of 5:30 a.m. on that date, and a "high ball" time of 1:30 a.m. When asked whether the baby could have been alive at 8:00 a.m., Dr. Germaniuk stated, "probably not."

4

{¶11} Appellant provided police with two statements, one on September 6, 2011 and one on September 8, 2011. In her initial statement, appellant denied harming A.B., asserting the child woke up with bruises but she could not account for their origin. She claimed she checked on A.B. at 8:00 a.m., kissed her, and gave her a sippy cup. In her second statement, appellant claimed her friend, Precious Stephenson babysat A.B. when she went out. In an apparent attempt to corroborate this statement, appellant asked Stephenson to give police a statement confirming that she was watching A.B. on Labor Day evening. Stephenson obliged and told police she sat with A.B. on Monday night and saw the child on Tuesday morning. Two weeks later, however, Stephenson visited police and corrected her story. She explained to police that appellant had asked her to lie for her; Stephenson then told police she neither watched A.B. on Labor Day night nor saw A.B. on Tuesday morning. Indeed, Stephenson stated the last time she saw A.B. was Saturday, September 3, 2011 and the child had no bruising on her face at that time.

{¶12} On September 15, 2011, appellant was interviewed by William Evans, owner of Investigative Safety. During this interview, appellant claimed Stephenson and her boyfriend, Chris Foster, who had a key to her apartment, were with A.B. from 9:30 p.m. September 5, until 3:00 a.m. September 6. During that interview, appellant suggested that, although Foster left around 3:00 a.m. and A.B. was fine at 8:00 a.m., he could have re-entered her apartment with his key and assaulted the child. Foster confirmed he had a key and told police he gave the key to Antonia Rodgers on Tuesday, the day A.B. was discovered dead. Foster claimed, however, he was not in appellant's apartment on either Monday or Tuesday. He further asserted he never

entered appellant's apartment unless appellant was with him. Foster further stated he had never physically harmed or disciplined A.B.

{¶13} On November 16, 2011, appellant was indicted on one count of murder, in violation of R.C. 2903.02(B) and (D); felonious assault, in violation of R.C. 2903.11(A)(1) and (D)(1)(a); and one count of endangering children, in violation of R.C. 2919.22(B)(1) and (E)(1). Appellant entered pleas of not guilty. The matter proceeded to jury trial on December 10, 2012, after which appellant was found guilty on all counts. At sentencing, the trial court merged the felonious assault and endangering children counts with the murder count. Appellant was then sentenced to 15 years to life in prison. This appeal follows.

{¶14} Appellant assigns two errors for this court's consideration. Her first assignment of error provides:

{¶15} "The trial court erred by permitting appellee to dismiss prospective black jurors through preemeptory [sic] challenges without satisfying the mandates of *Batson v. Kentucky*."

{¶16} Under her first assignment of error, appellant contends her right to equal protection was violated when the trial court permitted the state to exercise two peremptory challenges excusing two black jurors without race-neutral reasons for the prospective jurors' dismissal. We do not agree.

{¶17} In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court of the United States held that the use of peremptory challenges to strike African-Americans from a jury venire may raise an inference of discrimination compelling the prosecutor to set forth a racially neutral explanation for his or her actions. *Id.* at 97. In order to invoke

judicial scrutiny, however, a defendant must establish a prima facie case of discrimination. Once the defendant establishes a prima facie case of discrimination, the burden shifts to the state to come forward with a race-neutral explanation for the strike. *Id.* at 97. Next, the trial court must decide, based on all the circumstances, whether the defendant has established purposeful racial discrimination. *Id.* at 98. "A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶106, following *Hernandez v. New York*, 500 U.S. 352 (1991).

{¶18} In this case, appellant's alleged *Batson* violation is premised upon the state's decision to use peremptory strikes on prospective jurors Angellete Crosby and Carla Bradley-King. During voir dire, Ms. Crosby stated she knew defense witness Amanda Clay. According to Ms. Crosby, Clay is a member of her church and Ms. Crosby is close with Clay's mother. Ms. Crosby further stated she had a similarly close relationship with state's witness Vanity Wallace's mother. Ms. Crosby also stated her 18-year-old son had been convicted of a felony firearms violation.

{¶19} With respect to Ms. Bradley-King, she stated she was familiar with the court's witness Chris Foster. In particular, she went to school with Foster's mother and aunt. Ms. Bradley-King further stated she was still good friends with Foster's aunt. Moreover, Ms. Bradley-King stated her husband was killed in Detroit, Michigan in 2004. Although no one was arrested for the ostensible crime, Ms. Bradley-King "guessed" it was investigated. When asked whether, as a consequence of this experience, she had any animosity toward law enforcement or prosecutors, she answered in the negative. Ms. Bradley-King also stated many of her family members had been in trouble with the

7

law.  To wit, her cousin, Gary Smith, was in prison for murder; her mother was arrested for drug paraphernalia; her step-father had been arrested numerous times on drug-related offenses.  And, Ms. Bradley-King stated, certain other, deceased relatives were "in and out of jail for different reasons."

{¶20}  The state used peremptory challenges on each of the prospective jurors to which defense counsel objected.  The parties stipulated that each prospective juror was an African-American female.  The state subsequently waived the requirement that the defense establish a prima facie case for discrimination in interest of providing race-neutral reasons for the strikes.  With respect to Ms. Crosby, the prosecutor argued, "she knows mothers of witnesses on both sides, she knows the mother of Amanda Clay, and I believe she also said she knows the mother of Vanity Wallace.  She goes to church with them.  I am not comfortable, nor am I comfortable with the fact that her son in fact has been prosecuted for a felony firearms offense within the last five years."  Defense counsel had no specific response to the state's justification. The court subsequently found the state asserted an adequate race-neutral basis for the strike.

{¶21} Regarding Ms. Bradley-King, the state argued the prospective juror "indicated that she is close friends and keeps in touch with one of the witnesses, Chris Foster's aunt * * *.  Also she has indicated that she, her husband was murdered in Detroit in 2004 and when asked how she felt about that her response was, well, she guesses it was investigated.  And when we came back here in chambers because she had several people in her family that had been prosecuted I think the list was up to four four that she named, including her mother who had been arrested.  There was another family member, Gary Smith, who had been convicted of murder.  And there were a

8

couple other relatives who had been convicted of some felonies. And I think that I am not comfortable with her as a juror for those reasons."

{¶22} Defense counsel had no response to the state's race-neutral reasons for striking Ms. Bradley-King and the court subsequently allowed the peremptory challenge.

{¶23} As the voir dire process continued, two African-American jurors were seated on the panel; neither of these jurors were challenged by the state.

{¶24} The facts and surrounding circumstances of the voir dire support the trial court's decision that the peremptory strikes were not motivated by a discriminatory intent. There was no pattern of strikes against minorities and the strikes exercised were premised upon reasonable concerns that were entirely racially neutral. Despite her claim that the concerns prompting the exercise of the challenges were "beyond weak," appellant has offered no evidence of discriminatory intent. And the seating of two African-American jurors serves to refute any tacit inference that the state acted with a discriminatory purpose in exercising their strikes. We therefore hold the trial court's decision did not violate *Batson*.

{¶25} Appellant's first assignment of error lacks merit.

{¶26} For her second assignment of error, appellant asserts:

{¶27} "The appellant's convictions are against the manifest weight of the evidence."

{¶28} A manifest weight challenge requires an appellate court to consider the entire record, including the credibility of witnesses and potential conflicts in the evidence, and determine whether the jury clearly lost its way such that the verdict of guilty resulted in a manifest miscarriage of justice requiring a new trial. *See e.g. State v.*

*Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15 (Dec. 23, 1994). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case where the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶29} Appellant's conviction was premised upon circumstantial evidence. It is well-settled that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "Circumstantial evidence has been defined as testimony not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts sought to be established.*" State v. Windle*, 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶34, citing *State v. Nicely,* (1988), 39 Ohio St.3d 147, 150 (1988). An inference is "a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven." *State v. Nevius*, 147 Ohio St. 263 (1947). It consequently follows that when circumstantial evidence forms the basis of a conviction, that evidence must prove collateral facts and circumstances, from which the existence of a primary fact may be rationally inferred according to common experience. *Windle*, *supra*.

{¶30} Appellant was convicted of murder, which required the jury to find, beyond a reasonable doubt, that appellant caused the death of the victim as a proximate result of either felonious assault and/or endangering children. The state theorized that appellant was angry and frustrated by Brantley rebuffing her invitation for, what it characterized, a "booty call." It further claimed that appellant's irritation grew when Brantley questioned why she was at a party, rather than with their child who appellant

10

falsely claimed was in the hospital. Drunk and highly agitated, the state postulated appellant returned home and, in the course of addressing a possibly upset baby, appellant beat A.B. with sufficient severity to kill her.

**{¶31}** To prove its theory, the state presented evidence that appellant and various neighbors picnicked, drank, and smoked marijuana throughout the day on September 5, 2011. According to appellant's friend and neighbor, Precious Stephenson, appellant admitted she was "sloppy" drunk by the end of the night. Appellant went home after leaving the bar and there was no specific evidence submitted that anyone other than her and her children were in her apartment between 3:00 a.m. and the time A.B.'s body was discovered.

**{¶32}** In conjunction with the foregoing, the jury heard appellant requested Precious Stephenson to lie to police about watching A.B. on Monday night and seeing the child on Tuesday morning. And, although appellant stated she checked on the child at 8:00 a.m. and she was fine, Dr. Germaniuk testified that, given the significant rigor mortis of the body, A.B. had died between 1:30 a.m. and 5:30 a.m.

**{¶33}** Appellant argues the conviction should be reversed due to the lack of direct evidence linking her to the murder as well as the inferential possibility that Chris Foster actually committed the crime. She points out that Chris Foster possessed a key to her apartment prior to the murder. Foster testified he had relinquished the key to Antonia Rodgers at some point on Labor Day, September 5, 2011. He had previously told police, however, he gave the key to Rodgers on September 6, 2011. And Amanda Clay testified that, at between 10:00 p.m. and 11:00 p.m. on Labor Day, Foster let her into appellant's apartment with the key. Appellant contends this evidence was sufficient

to establish reasonable doubt as to her guilt and, as a result, the jury lost its way in convicting her of the crimes.

{¶34} We recognize that Foster's possession of a key on the night the murder created a possibility that he committed the crime; there was no other evidence, however, that would implicate him in the murder. Foster testified that he and appellant were in a relationship at the time of the crime and that he did have a key to her apartment. The evidence further demonstrated that both Foster and appellant were on good terms at the time the crime was committed. Foster testified that, even though he had a key to appellant's apartment, he never entered appellant's apartment by himself or when she was not home. And, Foster testified, he never disciplined, harmed, or otherwise laid his hands on the victim during the course of his relationship with appellant.

{¶35} Even assuming Foster possessed the keys on the night of the murder, so did Antonia Rodgers. Without some additional evidence indicating he was somehow involved in the crime, we fail to see how his possession of the key would undermine the jury's verdict in this case.

{¶36} The evidence demonstrated appellant was drunk and she was, at 2:30 a.m. on September 6, significantly irritated due to an argument she had with Brantley. It is undisputed appellant returned home immediately after this argument and there was no evidence that any other adult was in the apartment from 3:00 a.m. until the body was discovered. Dr. Germaniuk surmised A.B. died between 1:30 a.m. and 5:30 a.m. These direct facts, provide a basis for the rational inference that appellant was the individual

12

who assaulted A.B., causing serious physical injury, and that assault was the proximate result of her death.

**{¶37}** A conviction is not against the manifest weight of the evidence because the jury believes the state's version of events over a defendant's theory or defense. *State v. Gale*, 10th Dist. Franklin No. 05AP-708, 2006-Ohio-1523, ¶19. In this case, the jury found the state proved its theory of the crime beyond a reasonable doubt and we cannot say the jury so lost its way or created a manifest miscarriage of justice to require a new trial. We therefore hold appellant's conviction is supported by the manifest weight of the evidence.

**{¶38}** Appellant's second assignment of error is without merit.

**{¶39}** For the reasons discussed in this opinion, the judgment of the Trumbull County Court of Common Pleas is hereby affirmed.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.

13